Good morning, Judge Garth. Do you hear us loudly and clearly? Good morning, Judge Hardiman, Judge Stern. Yes, I do. And forgive me for not standing up when you came in. Not at all. The first cases this morning are LITGO v. Commissioner numbers 12-1288 and 12-1418. Mr. McGarren? Good morning, Your Honor. Your Honor, may it please the Court, my name is John McGarren. I'm with the law firm of Patton Boggs, and I'm here on behalf of appellants LITGO and Sheldon Goldstein. I'd like to reserve five minutes for rebuttal. Granted. I'd like to address four principal arguments in my opening argument, and if I get to the others, if there's time, I'll get to the others. But the four that I'd like to address are principally the liability of the United States as an owner for wartime releases, the operator liability of Sheldon Goldstein, the CERCLA allocation that was decided by the Court, and the fourth item would be the Court's refusal to award RECRA attorney's fees to the plaintiffs. With respect to the first issue, Your Honor, the appellants believe that the district court erred for two principal reasons. The first is that the district court ignored evidence that releases occurred at government-owned equipment. Specifically, in the course of utilizing the equipment, it was required to maintain the equipment. Equipment just doesn't operate continuously without maintenance, and the plaintiff's experts identified that the equipment would have to be maintained with solvents. That was standard practice at the time. Isn't that a factual finding that is entitled to some deference? Yes, Your Honor. But I think that the Court ignored provisions that were in the DPC lease in looking at this issue. In addition to Mr. Zock's testimony, the DPC leases themselves had provisions explicitly requiring the Columbia Aircraft Entity to maintain the equipment where they were going to be held responsible for the costs beyond ordinary wear and tear. So that factual finding, the Court – But how does the obligation to maintain the equipment necessarily require the factual finding that you advance here? It certainly supports it as a possibility, but how does it require it? Well, the District Court, Your Honor, did find that it was likely that the equipment was maintained using a solvent. The District Court, however, indicated that it wasn't proved that TCE was the solvent that was used to maintain the equipment, and indeed the government threw up a number of things at the wall, including the fact that phenols may have been used and acetone may have been used. But we're bound by the evidence, Your Honor, that exists, and this is an old operation. Many of the records no longer exist. Frankly, it's amazing we found as many records regarding this defunct facility as we did. Essentially, this was a small machine shop facility, and the Court found that the likely solvent used for degreasing purposes was TCE. TCE was found at the site explicitly in the bankruptcy records in the form of triad degreasing solvent, and vapor degreasers were identified on the equipment list. There was no evidence in the record that there was any other contaminant present in the plume that the United States alluded to, namely phenols and acetone. There's clearly an abundance of TCE in this plume, which is over a mile long and has shut down the Manville Wells to this date. So, Your Honor, the only evidence that is – That could have well gotten there through the JA NR warehouse, correct? It's possible, Your Honor, although the – And didn't the district court so find? Yes, the district court found that TCE from the JA NR warehouse impacted both the eastern plume, which is the mile-long plume that shut down the municipal wells, and they also found that the JA NR warehouse contributed to the western plume, and the United States was also responsible for TCE in the JA NR warehouse, which – And why is that factual finding clearly erroneous? The finding that I find clearly erroneous, Your Honor, is the finding that the TCE was not used to maintain the machines. It was ignored. The court also focused on two principal facilities in its findings. Number one, it focused on the entire property, and number two, it looked at the vapor degreasers themselves. And clearly there were other facilities within the confines of this site, which in the complaint included three separate properties owned by three separate entities currently. And it focused only on – Mr. McGarren. Yes, Your Honor. Mr. McGarren, I don't like interrupting you, but I know you have limited time, and I am very anxious to hear you speak about Mr. Goldstein as an operator, which is the second issue that you said you wanted to address. Yes, Your Honor. I'll get to that issue. With respect to Mr. Goldstein's operator liability, the court found and the United States admits that the only activity conducted on the site by Mr. Goldstein was cleaning up the site. And for that basis, the court found Mr. Goldstein as liable as an operator and cited to Best Foods, Your Honor, which stands for the proposition that the Supreme Court enunciated that operators are liable under CERCLA when they manage facilities that specifically generated hazardous waste and caused pollution. No court, at least I have seen no citation in the U.S.'s briefs or the Sanzari briefs, has found that a party whose only responsibility at a site is cleaning it up is responsible as an operator under CERCLA. I think that flies in the face of the two fundamental principles of CERCLA enunciated by the Supreme Court in Burlington, Northern. Number one, that the statute is designed to promote cleanups, and number two, that the polluter pays. Mr. Goldstein did not cause pollution in any way, shape, or form, and I think that's been found by the court and acknowledged by the defendants. So therefore, Your Honor, we don't believe that he is liable as an operator. What's the basis for reading a causation requirement in? I'm not reading a causation requirement in, Your Honor, but the case was tried as if causation was relevant here. I don't think causation is relevant. What I'm focusing on, Your Honor, is the best foods decision, which specifically defines an operator as someone who manages facilities that cause releases of hazardous substances, and clearly Mr. Goldstein did not do that. In fact, he didn't really control the cleanup. The way cleanups work is you submit plans to a regulatory agency, in this case the DEP, which was itself a liable party, and the DEP reviews those plans and then tells the responsible party whether the plan is acceptable or makes the party change the plan to do different things and additional things at the site. So to say that he controlled the cleanup I don't think is accurate in itself. All he did was hire consultants. Will it never be accurate that the current owner controls the cleanup if there's any environmental entity involved as well, an agency of a state or federal government is involved in any way? Well, not if the party is specifically submitting plans to that agency, Your Honor, and getting the comments and directions from the agencies and then following those comments and directions, and there's no evidence in the record of noncompliance by Mr. Goldstein whatsoever. There are mountains of documents that were submitted to regulatory agencies. They were all approved, and he did all the work until he brought the rec pursuit after discovering that the NJD itself was responsible for releases at the site. Isn't it true, though, Mr. McGarren, that a passive release, a passive migration can constitute a release under the law? Yes, it can constitute a release but not a disposal, Your Honor, but a release is enough here. He's a current owner. He's not a past owner. But 107A1, which is what's focused on here, Your Honor, uses the word disposal, not release, and disposal under this Court's decision in CDMG requires an affirmative action on the part of the defendant, not passive migration. I think this Court has already ruled on that. Mr. McGarren, are you familiar with the cases that Judge Oaks in the Second Circuit wrote with Judge Feinberg and Judge Newman at the State of New York versus Shore Realty Court? Yes, Your Honor, one of the early and seminal cases under CERCLA, and which pretty much outlines the liabilities of individuals such as Mr. Goldstein in every respect, including the release, including the disposal, including the management. And it was that that I had wanted you to really address because I will tell you that it seems very compelling, although CERCLA itself is not the clearest statute in the world. Well, Your Honor, I would just say that the Shore Realty case deals with owner liability and not operator liability, which is what Your Honor asked of me. So I don't think it's on point with respect to this. Well, of course, in that case, Mr. McGarren was in the same position as Mr. Goldstein. He was, in effect, the sole owner of the corporation, and liability was found for the both of them on every score. And I really would like you to tell me why we shouldn't do the same thing here. Well, Your Honor, again, I believe that Mr. Goldstein has only been found liable as an owner, as an operator, excuse me, as opposed to owner liability in Shore Realty. And I think that's the key distinction, Your Honor. That's the distinction that you make? Yes, Your Honor. Very well. I'd like to also address the allocation that was decided by the court, which we believe is an abuse of discretion and therefore requires review by the court. Specifically, the claims asserted by Litko and Goldstein were brought under Section 107A and sought joint and several liability against the defendants. That requires, when a case like that is brought and the case is put on for the defendants, the burden is shifted for them to establish what their fair liability is. That was never done in the course of this trial. I objected to it at the close of the case. I reserved my rights at the close of the plaintiff's case, and the court did not allow us that opportunity to put on evidence concerning allocation. The second point I'd like to address has to do with the paltry 2% assigned to the United States, which is the only party responsible for the release at the site of TCE other than the DEP, which is not currently before the court. Again, they were the only generator of TCE found both in the Janner warehouse, and there was clear and convincing evidence produced with respect to that. They claimed that the material was on pallets, that it looked okay, but the bottom line is there were manifests found showing that crushed bottles of the same nature as the TCE bottles found in the pictures were shipped off the site in drums, and there was numerous evidences of improper operations by the DEP's contractor and releases that occurred during that period, as well as- Doesn't this come within the district court's discretionary and inherent powers to allocate? I mean, it seems to me that your argument here runs a bit afoul of what Judge Hardiman had spoken to you about in terms of deferring to the district court on facts. Here, the district court made an allocation, made two allocations, as a matter of fact, at different times, and you would have us not defer to those, as I gather. Yes, Your Honor, because within the allocation sections of the opinion, there were two factors cited for apportioning 2% to the United States, which we believe were clear error. Number one, the court used the fact that the U.S. did not ship waste directly to the site as a factor, and if that was used to reduce liability, that would reduce the liability of the vast quantity of generators found liable in Superfund cases because there's a separate category of liability for people who ship waste under CERCLA, namely 107A4, which deals with transporter liability. So we believe that factor was irrelevant. The second factor is that she found that the U.S. The court found that the U.S. acted with due care, and that was based on the United States cross-examination of a DEP witness. There was no evidence put on that United States representatives acted with due care. In fact, there was evidence that they used contractors that shipped materials under bills of lading, which were hazardous waste. Therefore, the United States, as the generator of the material, violated the Solid Waste Act because those materials had to be shipped under manifest, and the generator has to sign those manifests. I thought the principal reason for the paltry allocation of the United States was a natural follow-on to the district court's holding on the degreaser issue. Because you did not persuade the district court on that, it almost necessarily followed then that the United States was going to get a paltry allocation. Had you prevailed on the degreaser issue, then the United States would have received a much, much higher allocation. Am I incorrect in ascribing that as part of the district court's rationale for the United States allocation? No, Your Honor, but the focus on the degreaser is at odds with the court's finding that the massive release occurred in the southeast corner of the property. The degreaser was not brought outside and dumped. There were all sorts of likely incidences, including maintenance of equipment, wiping with solvents, et cetera, which was then brought outside and dumped out back. So we find the focus on degreaser to be at odds with where the release occurred, according to the district court's finding. I believe I'm out of time, Your Honor. We'll hear you on rebuttal. Thank you, Mr. McGarrett. Well, I wonder, Judge Hardiman, before Mr. McGowan leaves the bench, if I don't understand his argument on RFRA attorney's fees, if, as I understand what has transpired in this case so far, there has been a dismissal with prejudice concerning RFRA. Yes, however, Your Honor, RCRA finds that parties that are substantially prevailing parties are entitled to attorney's fees. The initial suit here was brought against the NJDEP under RCRA. We prevailed in getting a liability finding not only against the DEP, but also against the United States. The goal of the plaintiffs was to get the responsible parties to do the cleanup. The DEP settled. A consent decree was entered. The United States opposed that settlement, which was designed to start the cleanup. You can't reward recalcitrant parties for preventing what the statute provides. Is that your argument? Thank you. Yes, Your Honor. Thank you. Thank you, Mr. McGarrett. Mr. Lane, did I pronounce that correctly? You must know a little German. It was a guess. A guess. I had a 33 percent chance. I represent the Senzari defendants, and if it pleases Her, we will rely on the plaintiffs' arguments with respect to increasing the liability that should be allocated or should have been allocated to the U.S. defendants. And the U.S., I understand, is going to address the issue of Goldstein as operator. I defer to that argument. And they'll also address RCRA and attorney's fees. It's their issue, not ours. I'd like initially to address the three grounds on which the district court attributed and allocated liability to Senzari because I think it represents an unfair weighing of all the factors and an abuse of discretion. The first factor I want to address is monitoring well number four. This was installed by Senzari's consultant, Hart, in 1989, and the evidence is unclear whether it was a faulty seal from inception or whether the seal failed within a year. But the key fact is Goldstein closed, this is the anniversary, Valentine's Day, 1990, and in 1990, the DEP presented Goldstein and his experts with peculiar readings from monitoring well number four. Instead of investigating, Goldstein sat on this and his expert, EWMA, sat on this for seven years, allowing the condition to worsen, and his subsequent expert, Sorge, replaced that seal in 2000. Significantly, as part of the closing with Goldstein in 1990, Goldstein received from Senzari an assignment of Senzari's rights against any tenants at the property and others, all others. So Senzari had no ability to pursue Hart over a faulty seal for two reasons. The property had been transferred to Goldstein. Before, Senzari was even aware that there was a problem with the seal and there may not have been a problem with the seal under his ownership of the property at monitoring well four, and he assigned all his rights to do anything about it to Goldstein. The district court only mentions in passing this assignment of rights and really did not give it any weight and due consideration. Now, Goldstein subsequently exercised this assignment of rights. He sued Waso Insurance as a former carrier of Senzari's and obtained money. It sued Dandy Plastics, a former tenant of Senzari's, and got money. It sued Hart and Earth Tech, former Senzari engineering and environmental consultants. You're doing a nice job giving us the facts, but I'm not sure where you're heading as a legal matter or as a remedy. The allocation was based on three factors as to Senzari. This was one of the factors. It was an improper weighing of the facts and a failure to really give consideration to this assignment, which prevented Senzari from doing anything about the seal. But once again, you're sort of standing on the same footing as far as I can tell as your friend on the other side because I thought the trial judge's emphasis vis-à-vis the Senzari allocation was that Senzari was the landlord of the JANR warehouse and that that was undoubtedly a large source of the pollution on the site. Am I mistaken? You now take me to the next part of my argument, which is the second issue on which the trial court found liability and made an allocation to Senzari. But that was also an abuse of discretion for the following reason. Senzari didn't generate the waste. It didn't cause it to be removed or stored from one property in Newark to the JANR warehouse where it was its tenant. Senzari did everything legally possible about the situation. Nor did Litco Generator store the waste. I mean, that's just part of the statutory regime is that we want these sites cleaned up, so even people who aren't responsible for being the initial polluters are in the soup, so to speak. Correct, but it goes to what degree of responsibility Senzari should bear. The DEP, under gross negligence, allowed and supervised the removal of the hazardous material from a Newark warehouse to the JANR warehouse, which wasn't equipped to handle it. You don't have to spend any time persuading me that the DEP is the real – if we have to call someone a villain in this drama, you don't have to persuade me it was the DEP. And there's something really, in my view, inequitable for all of you here today, that the principally responsible party is off the hook, but that's the law. I hear you. So pointing fingers at the DEP, it seems to me anyway, doesn't help you when trying to argue to us that your allocation vis-a-vis the other parties that could not take advantage of sovereign immunity was incorrect. Fair enough. On reconsideration, the trial court lowered Senzari's allocation by, I think, a paltry 4 percent over this JANR issue and recognized that Senzari did everything humanly possible within the bounds of the law to deal with the problem. The materials were moved to Senzari's property, to the JANR warehouse, without Senzari being aware of it or the Somerville authorities being aware of it. When they found out, they wrote letters, they demanded its removal, they went into court to evict JANR because it's a violation of the lease, to store hazardous materials there. They then went in on an order to show cause to deem the wastes abandoned and for an order permitting Senzari to remove them and dispose of it. Instead, the superior court in Somerville appointed a custodial receiver. The receiver brought in the DEP. The DEP brought in a cleanup company, Clean Ventures, and they proceeded to clean up in a sloppy way, which caused spills. And Senzari was excluded from access to his own property during this period. So it's really unfair to give much weight in Senzari's, in the allocation to Senzari, over this factor. In some way, because as you say, you're the owner. Did you make that argument before the district court? Yes, and on reconsideration, the district court lowered Senzari's allocation by 4%. Our position is that's paltry, that really wasn't adequate. It should have been larger. Yes. Your position is that the allocation that the district court made should have been weighted against the other parties rather than to you. Correct. And the third factor that I wanted to address, on which the court based Senzari's allocation share, is the allegation that Senzari failed to disclose the groundwater tests to Goldstein prior to the purchase. Mr. Lane, let me interrupt you before you get into that. You've mentioned a couple times there was the motion for reconsideration, and you got some relief. You say it's paltry. Is it fair, as we assess whether the district court abused its discretion for us to consider the fact that you did have an opportunity for a motion for reconsideration and you did prevail in part? Does that go to the abuse of discretion issue? It goes to it, but I don't think if the court didn't do an appropriate weighing of these factors on the reconsideration that it exonerates it of the issue of abuse of discretion. What if it had reduced your share 10 percent? Abuse of discretion? That's a hard one. Not on that issue alone. I would have said on that. I'm speculating now. I would have said for this issue I would have accepted 10 percent, but there are other issues. What about 7 percent? No. I think it has to be 10 or greater. But just on that one factor. There are other factors that should have greater effect than it had. We are to decide that the trial court abused its discretion by reducing your allocation 4 percent, and it would have abused its discretion reducing it 7 percent but not 10 percent. I think it should be at least 10 percent. How was the trial court to have the foresight to know that the line of demarcation between where its discretion began and where it ended was 10 percent? Well, again, I think that's one of three factors, and I think on each of the factors the court didn't do what it should have done. So if it's 10 percent, a minimum of 10 percent on one factor, it may be 10 on another and 10 on another. So it's not that simple. I don't think you can view one of the three issues in isolation. Mr. Lane, let me challenge you on one issue not raised by Mr. McGarren but gives me some pause. It seems to be the overwhelming weight of authority is that the RCRA claim should have been brought exclusively in the federal court. I know that you have a Sixth Circuit decision that goes your way on that, but there are many, many other decisions going the other way. And my problem, frankly, with the Sixth Circuit's analysis is that it looked to a Title VII statute that had what appears to me at first blush to be remarkably different language than the language here. Why is there not exclusive jurisdiction in the federal courts on that issue? The general presumption, overwhelming presumption, is in favor of concurrent jurisdiction, and there must be a strong affirmative statement in the statute that divests the state court of jurisdiction. Judge Scalia's dissent in the Taplin case makes that point quite clear. The RCRA statute doesn't say the suit will be brought exclusively in the district court. And the lower court, the district court in Davis, said and read the statute as a modifier of the venue provision in the statute. In other words, it read the statute to say if you're going to bring a suit, you must bring it in the district where the damage occurred. Now, the Sixth Circuit didn't really go, you know, adopt that or go into that basis for the reasoning, but that's another grounds that distinguishes the RCRA statute. But the RCRA statute doesn't say it shall be brought in the district. It says it shall be brought in a district court for the district in which the alleged violation occurred. Yes. How does that not overcome the strong presumption of concurrent jurisdiction? Because it doesn't say exclusively, because it may just be saying that if you're going to bring the action, the venue has to be in the district where the actual violation occurred. And you also have Yellow Freight and Taflin both construing similar language that didn't have the exclusivity language. And a lot of the other cases that have dealt with this issue were and found that you had to bring the suit exclusively in the U.S. District Court, were pre-Yellow Freight, pre-the Supreme Court in Taflin, pre-Davis, and a number of the other cases were really focused on abstention. For example, this court in Raritan Baykeeper in DICTA assumes exclusive jurisdiction in district court. Mr. Lane, is Davis the best explication you have of your position on this issue? Davis, Taflin, and Yellow Freight. And a lot of the other cases are before them. One that's not, Interfaith by Judge Greenaway, doesn't get into any significant analysis of the issue. He just says, I decline to follow Davis, and doesn't analyze Yellow Freight or Taflin. And in Raritan Baykeeper, it was DICTA that we're dealing with from the Third Circuit, but also in that case, both a plaintiff and defendant apparently assumed jurisdiction would be exclusive in the district court, and therefore, they couldn't get the Supreme Court of New Jersey or of the state to review this issue of law, and thus, there was no basis for federal court to abstain. So the other cases that just assume, without discussing really, whether the suit must be brought exclusively in the district court, are focused on abstention as the main attention of the analysis. But to answer you, Judge Stark, again, Taflin, Yellow Freight, and Davis, and the district court in Davis as well. Mr. Lane, let me address one other issue with you. As I understand your argument regarding the Litko appellant's request for prejudgment interest, I believe you concede that prejudgment interest is mandatory in a Section 107 action, but you argue that, in essence, this case was converted to a Section 113 action. Is that correct? Yes, that's the argument. There are cases that it's discretionary if it's a contribution claim. I think we cited Caldwell Trucking. I mean case support for the conversion issue. Are there any other courts that have held that what appeared at first to be a 107 action was converted de facto to a 113 action? I'm not aware of anything other than what's in the brief. I don't recall that we had one in the brief. I will point out something that may be relevant on this. The U.S. defendants moved for summary judgment for a determination that the plaintiffs were PRPs, potentially responsible parties. Once that became the law of the case, that's what made this a contribution case. Because everybody became potentially liable for a share. And that's what I think is what determined this becoming a contribution case. Let me ask you something, if I may. Recovery claims from contribution claims. Yes, Judge Hardiman. What is your position on the very question that Judge Hardiman asked you about? Do you claim that the prejudgment interest that the district court denied is mandatory or is it discretionary for the district court to order? What's your claim? Even though the statute says it is mandatory. That was the issue I wanted to find out about. And what do you suggest under the circumstances that we do about it? I hold that it is mandatory. Because I think you have to look at it as a contribution case because you look to the substance of what the claims really became and how it was litigated as not just mechanically how it was pleaded by the plaintiff. Otherwise, the plaintiff will always plead it in a way most favorable to the plaintiff. I think you look to the substance of what the case became. And in addition, when you look at the exercise of discretion, recall several factors. Goldstein did nothing to remediate for almost 20 years. He tried to convince the DEP that he didn't have to. That the contamination came from off-site. He then hired the former DEP commissioner, Daggett, who has no environmental background. He was an educator, to try to have a political solution to convince the DEP that he didn't have to clean up. And as the district court found, Goldstein, by his inaction, by preferring to litigate rather than mitigate or remediate, worsened the environmental condition. And his own experts had testified that it had worsened by not being cleaned up. He told his experts to drag their feet, specifically, while he tried to work out a political solution. So, and this is the third suit Goldstein brought against Cenzari. He preferred to litigate for five years while this case was pending. We know the fact. Before I ask my colleagues if they have any final questions of you, are there any issues that you very briefly want to touch upon that you've not yet had an opportunity to mention? Very briefly. I don't have any other issue. Pardon me? The trial court erred in finding that Cenzari did not disclose the well water tests. But even, and none of the witnesses who would have had knowledge were called by plaintiffs. That is, the environmental engineer who did the testing, Cenzari's lawyer who would have transmitted the tests, and the Goldstein lawyer who would have received the tests. But in addition, it doesn't matter, because it is undisputable that Goldstein was aware of the well water tests, the monitoring well tests. In June 1989, before he closed on the property, he acknowledged in an affidavit that he had received the HART report that analyzes and discusses the very ground water test results that they now claim to be the cause of the well water tests. And he never saw that Goldstein never got. The point is, then, that's why their allocation was more than justified, and you wish they had a higher allocation. That I wish Goldstein did or the U.S. did, yes. Okay. All right. We understand that argument. Thank you. Anything further, Judge Garth, for this advocate? No. No, thank you. Thank you very much, Mr. Lane. We're here for Mr. Toth. Mr. Toth, before you begin, I'm afraid I'm going to forget this, but I wanted to ask you your view on this argument about a 107 action being converted to a 113 action as a way to avoid, as a way to avoid, you know, the mandatory award of attorney's fees? Attorney's fees are prejudgment interest. I'm sorry. Excuse me. Prejudgment interest. Thank you. Well, we don't have a position on that, you know, as in our brief. The issue doesn't directly affect us. We think that it was converted for other purposes, which is that there was no... No, I'm just asking. I assume you litigate a lot of environmental case on behalf of the government. Maybe that's a bad assumption. No, I'm in the environmental division. Okay. So what's your view? I'm interested in your view as an experienced advocate familiar with this issue. What's your view on that prejudgment interest argument? Well, I think it's indicative here the United States stipulated to paying prejudgment interest. So we thought it was available, at least in terms of settling it for stipulating to cost. So I think that's the best indication of our possibility. All right. Thank you. After a three-week bench trial in this case, the district judge issued 80 pages of findings of fact and conclusions of law, holding all the parties here on appeal liable under CERCLA. And it then allocated costs based on equitable consideration of various factors that it explained in its findings. Contrary to the established principles of appellate law, Litigo asks this court to reweigh the evidence of trial, to draw inferences from the evidence in its favor, and contrary to the fact finding of the district court, and to upset the allocation that the district court arrived at based on arguments that the district court didn't balance the equities correctly. These arguments are all without merit. It's not the appellate court's proper role to undertake these tasks. I'd like to address first the argument about U.S. liability as an owner of equipment during World War II. And there is a fact finding specifically on that by the district court, or conclusion of law, I should say, which is that she says on page 94 of the record that there's no evidence linking government-owned equipment to chlorinated solvents during World War II. And it's true that Litigo presented evidence that there was a possibility, in the words of their expert chemist, that a government-owned equipment could have been wiped down or sprayed with TCE or trichlorinated ethylene, but that's just a possibility. And when the district court made a finding in fact to the contrary, that there is simply another possible way to view the evidence isn't enough to establish that there was clear error. There has to be only one way that the evidence can rationally be viewed, and they simply haven't demonstrated that because their own expert admitted at trial that alkaline cleaners, in fact, could have been used. So you have to defer to the district court's finding, in fact, on that issue. As to Goldstein's liability as an operator, my opposing counsel has it wrong on the distinction between A1 and A2. A1 deals with present operators and does not require disposal. Now, disposal is required of past operators, which would be the United States here. But Goldstein here was a... Mr. McGarren just told us it's both. Why is he wrong on that? I thought it was current operator release, past operator disposal, but he argued otherwise a few moments ago. Why is he wrong? I would just urge the court to look at the text of the statute. It's in A2, not A1, and the CDMG case makes the distinction on that basis. And it reads into the word disposal. I mean, this is important here because it reads into the word disposal, that requirement of human action, that's only required for past operators in the opinion of that case. If there were an action requirement read into the term operator, it would apply to both A1 and A2, and that would render the distinction that the court drew in CDMG realty meaningless. So the provision that deals with present operators, like Mr. Goldstein, does not require disposal. And to impose that action requirement wouldn't give the statute as a whole the required meaning. What about the chilling precedent here that Mr. Goldstein argues? Well, there's, you know, it's going to encourage, it's not going to discourage people from cleaning up properties. It's going to encourage them to fully investigate with due diligence before they acquire properties and agree to bear the risk, as Mr. Goldstein did here. And additionally, the cleanup that was done here was a halfway cleanup. It was remediation of the soil and excavation of the soil, but the groundwater problems were not addressed in any timely fashion by the present owners. So it's not that we have somebody who's fully cleaned up the property. It's an incomplete cleanup, so there's no chilling effect to speak of there. As far as explaining the plume, I think my opponent said that the plume of contaminants in the groundwater is better explained by the use of TCE on equipment during World War II. The district court found that there was such a quantity in the ground that it had to be explained by some dumping rather than use of TCE on equipment. And that dumping would have been done by Columbia Aircraft, not by the United States. I apologize for going back to the first issue, owner issue. As far as allocation goes, the burden did not shift here because, as counsel for the Sanzari defendants pointed out, there was summary judgment ruled before trial, and the court found that Litko was a liable person under CERCLA as a present owner of the property. It raised an innocent owner defense that the court rejected as a matter of law. So as far as burdens of demonstrating contribution, all parties were on equal footing at the beginning of trial. And even though Litko argued for an all-issues trial and knew that it had an all-issues trial before it, it's now adopting a contrary position and did so only through a motion for reconsideration once the court went ahead. Mr. McGarren said he objected and he was not allowed to present evidence of allocation, didn't he? My recollection is that the district court decided he objected through a motion for reconsideration. Oh, but not at trial? That's my recollection of the record. Okay. Well, we can ask him about that. Go ahead. As far as the United States share goes here, the United States was only involved in an attenuated way in the disposal of waste at the Janner Warehouse, I'll call it. There were three materials, three types of materials there that were found attributable to the United States, and the court found that there was no evidence showing that any of them had actually released chlorinated solvents into the environment. And furthermore, the United States was not the entity that made the decision to send those materials to the Janner Warehouse. That was made by a third party. The fact that there were other containers of chlorinated solvents that New Jersey's contractor crushed or spilled during its cleanup is not something that puts the United States on the hook as an equitable matter for more than a minimal share here. And it wasn't an abuse of discretion for the district court to decide that in the first instance. As far as the issue of RCRA attorney's fees, that should be, if it wasn't abundantly clear before that the plaintiffs had not obtained judicially sanctioned relief to constitute prevailing party status, it should be abundantly clear now that they've dismissed their claim without prejudice, that they never got any final relief. And that under Buchanan is required for a party to be prevailing party under attorney's fee statute. RCRA does use language that says substantially prevailing in addition to prevailing party, and that's a minor distinction with Buchanan. But the Ninth Circuit, in the context of RCRA, applied Buchanan and rejected the argument that the word substantial added anything meaningful to prevailing. If anything, the Ninth Circuit found, and this is in the CASA case that we cite in our brief, if anything substantially means prevailed to a more significant degree. Might be a higher standard. Correct. Because we know at least from other fee shifting statutes like 1983, Section 1988, which is the fee shifting provision, prevail could mean $1. Yes. Which might not be substantial. Substantial would be an increase, a heightened requirement. Additionally, the fact that plaintiffs prevailed against the New Jersey Department of Environmental Protection is not enough for them to get a fee award, as against the United States. And the case on this is in the district court's opinion on fees that sell Ferrari against Hobby. Can I just ask you to address the issue of the New Jersey DEP getting off the hook here? Is that just an unfortunate byproduct of the legal regime? It seems really unfair to these parties, but I understand sovereign immunity, sovereign immunity. What's your experience with this sort of scenario, if you can speak to that? Well, where the United States is asserting claims against states, there's no issue of waiver. You don't suffer the same pain that Litko and Sanzari are suffering here. You get your licks in with the states. That's right. So it doesn't terribly, it doesn't affect us directly. And, you know, the district court was, it considered the allocation to New Jersey and how to distribute that orphan share. It considered that as a matter of its equitable discretion in the first instance. Did it have to do that? Could it have refused to distribute the orphan share? If it refused to distribute the orphan share, you know, it's hard to say. I mean, could the district court have said, you know, Litko is 54 percent, Sanzari is 21 percent, the United States is 2 percent, New Jersey is 23 percent, and, you know, what New Jersey did here was reprehensible and incompetent, so I'm not going to increase the proportionate shares of the other three parties. Did the district court have the discretion to do that? I don't know that it would have been an abusive discretion for it to have done that. I don't think it was compelled to do so here, though. You know, and it may not make a difference because the share was distributed pro rata according to what the party, I mean, maybe I'm recalling incorrectly. Well, it was pro rata, but I guess what I'm asking is Litko, because of the distribution of the orphan share, Litko's share went from 54 to 70, Sanzari went from 21 to 27, so they're incurring increased costs, are they not? Right, that's fair. And did the district court have to distribute the orphan share or could it have just been satisfied with less than 100 percent liability by refusing to do so? No, I don't think it would have been an abusive discretion not to distribute the orphan share. I just, I don't think it was compelled to do so here, to refrain from distributing here. Right. Unless the court has any other questions, I'm out of time. No, thank you, Mr. Toth. We'll hear Mr. McGarren on rebuttal. Would you mind starting with what we finished with on, was there any argument about whether the orphan share should just not be distributed? I don't recall that. Your Honor, I believe the orphan share had to be distributed in the context of this case and that the plaintiffs in this case sought a finding of joint and several liability. That's the fundamental principle under CERCLA. It's joint and several liability. It doesn't mean that you're only liable for your fair share. In this case, Your Honor, in response to your question about the distinction between 107 and 113, the only claim asserted under CERCLA was a 107A claim. There is a case in this circuit, Aguirre, which deals with the distinction. It's a recent case between 107 and 113. This case is distinguishable from that case where the court converted the 107 claim into a 113 claim for the very simple reason that the plaintiffs in that case were operating under a consent decree which provided for a right of contribution and it provided for contribution protection. And the court was concerned that the defendants would be unfairly prejudiced by the contribution protection provision in the consent decree. So here I don't think that's an issue because we only have a 107 claim. There's no issue along the lines of Aguirre. You're only seeking prejudgment interest from Sansari at this point because you already have it from the U.S. Is that correct? Yes, the U.S. stipulated to it, Your Honor. And, you know, that's not a significant amount in the context of this. I'd like to step back, Your Honor, to the owner liability issue again because there's a second point that the United States didn't address which is addressed in our briefs, and that is that the U.S. is also an owner of a process installation. Now, two recent courts. All right, but before you go there, does that mean you don't have a rejoinder to what Mr. Toth just argued about why release is sufficient and disposal is not required? With respect to the CDMG decision? Yes. I think, Your Honor, I misspoke when I discussed 107A1. It does not include a disposal. Okay. All right. Then let's hear about the installation. The installation itself, Your Honor, there's two recent cases, both of which involve the United States. In one instance, the United States was the enforcer. That's the Saperito case. And there the court found that you don't have to own exactly the piece of equipment that discharged it, which is similar to the decision in El Fatahkam which occurred within this district. It's that you don't have to own any specific piece of equipment. Saperito focused on the heartbeat of the operation. Here the government owned 43% of the total value of the equipment. They owned the biggest pieces of equipment. If you compare the equipment list from the DPC leases with the equipment list from the Certificates of Necessity, the big dollar items were owned by the United States, and the DPC leases themselves specifically say that this equipment was necessary to produce the products at this facility, which is the court's finding in Saperito. It's also the court's finding in ASIC, or American International Specialty Insurance Lines, which is a case that was in the Central District of California, which involved the United States as a defendant. And in that case, Judge Motz also found that while the government may not have owned the pipe from which things were discharged, government equipment was owned and it was a necessary part of the operation. The DPC leases, which there's at least three of them in the record here from 1942, specifically say that this equipment was necessary. In fact, the United States Defense Corporation and War Department had to make those findings in order to provide equipment to a private operator. So I think there's no issue here on that. And on that basis alone, the United States should be held liable and consistent with the rulings in Saperito and ASIC. With respect to the claim brought against the Sanzari court, Sanzari defendants, we believe that there's exclusive jurisdiction in federal court. And while it may be dictated in the Third Circuit decision, in the Raritan Baykeeper decision, by Judge Greenaway below, who's now a member of this court, he found directly opposite to the court in the Litgo decision that it is exclusive in federal courts. There's one other point I'd like to raise, and that has to do with the due care issue that was found by Judge Thompson.